1AO 91 (Rev. 5/85) Criminal Complaint

# UNITED STATES DISTRICT COURT

_____ DISTRICT OF MASSACHUSETTS _____

UNITED STATES OF AMERICA

v.

**JUAN NUNEZ**

(Name and Address of Defendant)

**CRIMINAL COMPLAINT**

M.J. No.: 2004-M-0509RBC

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. In or about **December 2003** and continuing to in or about **October 2004**, in **Middlesex and Worcester** Counties, in the District of **Massachusetts** and in the **Eastern District of New York**, defendant did, (Track Statutory Language of Offense)

**Conspire to possess with intent to distribute and distribute a mixture or substance containing a detectable amount of heroin, a Schedule I Controlled Substance**

in violation of Title **21** United States Code, Section **846, 841(a)(1)**

I further state that I am a(n) **Special Agent - DEA** _____
                                        Official Title

and that this complaint is based on the following facts:

**See Attached Affidavit of Special Agent Calice Couchman.**

Continued on the attached sheet and made a part hereof:    [x] Yes [ ]No

_____
Signature of Complainant
**Special Agent Calice Couchman**
**Special Agent, DEA**

Sworn to before me and subscribed in my presence,

**October 15, 2004** _at 2:09 pm_ at    **Boston, Massachusetts**
Date                                         City and State

**ROBERT B. COLLINGS**
**United States Magistrate Judge**
Name and Title of Judicial Officer              Signature of Judicial Officer

HON. ROBERT B. COLLINGS
UNITED STATES MAGISTRATE JUDGE
United States District Court
United States Courthouse , - Suite 6420
1 Courthouse Way
Boston, MA 02210

## AFFIDAVIT OF SPECIAL AGENT CALICE COUCHMAN

I, Calice Couchman, being duly sworn, do hereby depose and state under oath as follows:

### I. Introduction

1.      I am a Special Agent with the United States Department of Justice, Drug Enforcement Administration ("DEA") and have been so employed for over 19 years.

2.      I submit this affidavit in support of an application for a criminal complaint against **JUAN NUNEZ** charging him with conspiracy to possess with intent to distribute and to distribute 100 grams or more of a mixture or substance containing a detectable amount of heroin, a Schedule I controlled substance, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B) and 846.

3.      I incorporate herein by reference the affidavit in support of a criminal complaint against **JULIO CARRION SANTIAGO, a/k/a "MACHO," PEDRO ALBERTO MIRANDA, a/k/a "TAVO," REYNALDO RIVERA, a/k/a "REY", JOSE RODRIGUEZ, ENRIQUE AGOSTO, JOSE TORRADO, CARLOS SANCHEZ, a/k/a "CARLITOS," LUIS R. SANCHEZ, a/k/a "PITO," EDWIN TORREZ, a/k/a "COQUI, a/k/a TIM," ZULEIMA REYES, a/k/a "LINDA," and SANTIAGO ARROYO** that was submitted to this Court on October 14, 2004 ("the SANTIAGO complaint affidavit"). A copy of the SANTIAGO complaint affidavit is attached hereto as Exhibit 1.

4.      This affidavit includes a summary of events that I am personally familiar with as well as information related to me by other law enforcement personnel who have been working on this investigation. This affidavit does not set forth all the facts developed during the course of this investigation. Rather, it sets forth only those facts that are necessary and sufficient to establish the requisite foundation for issuance of a criminal complaint against NUNEZ.

### II. Seizure of Approximately 500 Grams of Heroin from SANTIAGO on October 15, 2004

5.      As recounted in the SANTIAGO complaint affidavit, in the past few months, SANTIAGO has regularly traveled to 930 59th Street, Brooklyn, New York. Based upon intercepted

1

calls, the nature and frequency and timing of his trips there, I believe that SANTIAGO was obtaining heroin from a source of supply located at this address.

      6.      On September 15, 2004, SANTIAGO received a telephone call on Target Telephone 3 from 718-598-5109 subscribed to by Jose Perez, 1241 39th Street, Brooklyn, New York at 10:33 p.m. The call lasted approximately 1:06 seconds. (I note that DEA was not intercepting Target Telephone 3 at this time). The following day, September 16, 2004, the GPS device on the SANTIAGO minivan indicated that SANTIAGO left his residence in Leominster at approximately 9:57 p.m. and traveled to 930 59th Street in Brooklyn, New York. Although there was no surveillance conducted of this trip, the GPS device indicated that the SANTIAGO minivan stayed at this location for approximately five hours before leaving at 2:53 a.m. and returning to SANTIAGO's Leominster residence at approximately 6:33 a.m.

      7.      On September 27, 2004, the GPS device on the SANTIAGO minivan left his Leominster residence at approximately 10:20 a.m. and arrived at 930 59th Street, Brooklyn, NY at approximately 1:45 p.m. Surveillance at this location observed SANTIAGO arrive in the SANTIAGO minivan and enter the 59th Street residence. According to pen register data on Target Telephone 3, SANTIAGO called a pager, (917) 500-8132 (subscriber information is still unknown) at 1:47 p.m. and then received an incoming call at 1:49 p.m. from the same telephone number, 718-598-5109 that he had been contacted by on September 15th. (Again at this time, DEA was not intercepting Target Telephone 3). At approximately 3:00 p.m., surveillance saw SANTIAGO and an unknown Hispanic male[1] leave the residence and enter the SANTIAGO minivan which was parked in front of the building. Prior to the two getting into the van, a gym bag was taken out of the back of the van. While SANTIAGO and the unknown male were in the SANTIAGO minivan, a taxi

---

[1]Although his identity was unknown at the time, agents later identified him as NUNEZ, the same person who was observed with SANTIAGO on October 14th and 15th as discussed below.

arrived and dropped off an unidentified Hispanic female.[2] The unknown Hispanic male got out of the SANTIAGO minivan and paid the female's cab fare. At this time, SANTIAGO, the unidentified man and woman went into 930 59th Street. Later that day, surveillance saw the unknown male and female and a young child leave the address and go to the subway that was enroute to Manhattan. Surveillance did not follow them, but they returned to this address several hours later. Surveillance of the location continued until approximately 8:30 p.m. During this time, SANTIAGO was not seen leaving the address. The GPS device showed that SANTIAGO's minivan left Brooklyn, New York at approximately 3:00 a.m. and arrived back at his Leominster residence at approximately 6:35 a.m. According to pen register data on Target Telephone 3, SANTIAGO received an incoming call from 718-598-5109 at approximately 11:48 a.m. on September 28, 2004 and made an outgoing call to the same number at approximately 1:42 p.m. The following day, September 29th, the day before interception on Target Telephone 3 began, SANTIAGO received another incoming call from this number that lasted 2 minutes and 39 seconds.

8.      Earlier this month, SANTIAGO was again in touch with an unidentified individual at the same Brooklyn telephone number, 718-598-5109. In a October 6, 2004 call at approximately 3:26 p.m., an unidentified male complained to SANTIAGO about SANTIAGO not calling him. In the course of this conversation, SANTIAGO asked him if he was "done with the factory job." The male indicated that he was, more or less, and that he may be leaving for Santo Domingo the following day (meaning that he was going to his drug supplier the following day). The male asked SANTIAGO if he was going to travel and SANTIAGO said that he was going to see if he could get some vacation so he could go to Santo Domingo as well (meaning whether SANTIAGO was going to visit his supplier and SANTIAGO indicating that he was going to do so). At the end of the conversation, SANTIAGO said that he would call the caller sometime this week if he decided to go to Santo Domingo (meaning go to his supplier). Although there was no surveillance of this

---

[2]Although her identity was unknown at the time, agents later identified her as Paola Frey, the same person who was observed with NUNEZ on October 14th and 15th as discussed below.

trip, the GPS device on SANTIAGO's minivan showed that he traveled to 930 59th Street in Brooklyn, New York on October 7, 2004 and then returned early the following morning to his residence in Leominster. Two days later (October 8, 2004) at approximately 1:02 p.m., SANTIAGO received a telephone call from the same caller from same number, 718-598-5109. SANTIAGO asked caller if everything was fine. Caller replied that everything was fine. In the course of this conversation, SANTIAGO said that "the trip went well for him."

9.        Based on my training and experience, I know that New York City is a source city of heroin for drug-traffickers in the New England area generally and in Massachusetts in particular. Moreover, the manner in which Santiago's minivan was driven to Brooklyn on each of these occasions: it was driven non-stop down to Brooklyn, New York and approximately three hours non-stop back from New York in the middle of the night and remained at its apparent destination for less than a day and then returned to SANTIAGO's 264 Mechanic Street residence-- combined with the fact that SANTIAGO uses only the SANTIAGO minivan when transporting heroin to his customers makes it likely that the minivan was driven on these occasions to take delivery of and to transport back to Massachusetts a quantity of heroin for re-distribution by SANTIAGO.

10.      On October 13, 2004, there were several intercepted calls between SANTIAGO and the caller from the 718-598-5109 number. At approximately 6:36 p.m., SANTIAGO received a call from this number on Target Telephone 3. During the course of this conversation, SANTIAGO asked the caller if they (meaning the two of them) were ready for the fight. SANTIAGO said that he was ready and was waiting for the caller. The caller told SANTIAGO to call him when the caller got home. SANTIAGO asked him to let SANTIAGO know so that he could go and buy the tickets. Later that evening, at approximately 8:23 p.m., the caller from 718-598-5109 called SANTIAGO again on Target Telephone 3. After a brief discussion about the Red Sox and Yankees game, the caller asked SANTIAGO if he wanted to go (unintelligible) tomorrow and SANTIAGO responded that he would let him know. SANTIAGO again asked if he was ready to watch the game and the caller said that SANTIAGO would have to come get him.

SANTIAGO said that he would let him know. The caller told SANTIAGO that the finals were this week. SANTIAGO reminded the caller that they owed the lady some tickets. The caller acknowledged this and said that they should just go. SANTIAGO said that he would let him know because he had the weekend off. The caller said okay, but added that he would not be able to watch the game on Saturday night because he had to see his brother. SANTIAGO said okay and added that he would be there "early on the weekend."

11.    Yesterday (October 14, 2004), the GPS device showed that the SANTIAGO minivan drove from Massachusetts to New York. Based upon this information and the previously intercepted calls, I believed that there was probable cause to believe that SANTIAGO was traveling to 930 59th Street in Brooklyn, New York for the purpose of obtaining a quantity of heroin and that the October 13th intercepted calls indicated that SANTIAGO was making arrangements with the caller to do so. Accordingly, surveillance was established at 930 59th Street. Surveillance observed SANTIAGO arrive in the SANTIAGO minivan at 930 59th Street in Brooklyn, New York around 2:20 p.m.

12.    When SANTIAGO arrived, a unidentified Hispanic male (later identified as NUNEZ) emerged from 930 59th Street carrying a small black plastic bag. NUNEZ went to the driver's side of SANTIAGO's minivan and handed the bag to SANTIAGO. The two men had a short conversation after NUNEZ handed SANTIAGO the bag. Then, NUNEZ walked over to a gray Chevy Impala registered in his name at 618 Old Town Road, Port Jefferson, New York, with New York license CXG9550 and drove away. Surveillance followed him and observed him park on 9th Avenue at 60th Street, Brooklyn, New York which is a short distance away from 930 59th Street. In the meantime, SANTIAGO was parking in the space in front of 930 59th Street that NUNEZ had just vacated. SANTIAGO then waited in SANTIAGO minivan. When NUNEZ returned, NUNEZ went to the passenger side of the SANTIAGO minivan and opened the sliding door and took a garment bag out and took it into the residence. SANTIAGO followed him inside the building at 930 59th Street at approximately 2:55 p.m.

5

13. At approximately 4 p.m., NUNEZ, an unidentified woman (later identified as Paola Frey) and a small child exited 930 59th Street. They walked around the block and got into NUNEZ's vehicle and drove away. Surveillance followed NUNEZ's vehicle to 51st Street and 5th Avenue where surveillance agents observed the three going into a furniture store. When they exited the store, NUNEZ's vehicle headed back to 930 59th Street. Once back at that address, NUNEZ dropped off Frey and the child and they entered the building. NUNEZ then drove to the area of 59th Street and Port Hamilton and parked. NUNEZ walked back and entered 930 59th Street at approximately 5:40 p.m.

14. At approximately 2:20 a.m., surveillance observed SANTIAGO and NUNEZ exit the building 930 59th Street. Surveillance observed that SANTIAGO was not carrying anything, but NUNEZ was carrying the same garment bag that NUNEZ had taken from the SANTIAGO minivan when SANTIAGO had arrived. SANTIAGO went to driver's side of the SANTIAGO minivan and got in. NUNEZ went to the passenger's side and opened sliding door, put the garment bag inside and then shut the door. NUNEZ then got into the front passenger seat. The two men sat in the vehicle for approximately 5 minutes. To surveillance, it looked like they were manipulating something in front seat area. Then, NUNEZ got out and went back into the building. SANTIAGO drove away and surveillance agents followed. (Other surveillance agents remained at the 930 59th Street location).

15. SANTIAGO's minivan headed east on the Brooklyn Queens Expressway and exited the highway at the Manhattan Bridge exit. Shortly thereafter, agents stopped the SANTIAGO minivan and arrested SANTIAGO. SANTIAGO was carrying Target Telephone 3 in his pocket.

16. Pursuant to a search warrant, the agents then conducted a search of the SANTIAGO minivan. The search uncovered approximately 500 grams of a substance that later field-tested positive as heroin wrapped in a black plastic bag. The bag containing the heroin was found inside a hidden compartment in the portion of the dashboard where the passenger-side airbag usually is located. Another cellular telephone was also found in this location.

6

### III. Arrest and Search of NUNEZ's Apartment

17.    While SANTIAGO was being followed, surveillance had also remained in place at 930 59th Street. Later that morning, after SANTIAGO's arrest and the search of the SANTIAGO minivan, agents entered 930 59th Street and went to Apartment 4 that was located in the rear of the second floor of the building and knocked on the door. (I note that Con Edison records list NUNEZ as the subscriber for this apartment with a contact telephone subscribed to in the name of Frey, NUNEZ's girlfriend). Using a ruse, the agents had NUNEZ exit the apartment and arrested him in the hallway outside of the apartment.

18.    Task Force Agent Terry Hanson then spoke with Frey. Frey said that the apartment was her apartment. Frey gave consent to search the apartment and signed a consent to search form. Task Force Agent Hanson asked Frey if NUNEZ had a pager. Frey indicated that he did and brought a pager to Task Force Agent Hanson. When asked what the number was for the pager, Frey checked her cellular telephone and said that it was (917) 500-8132. This pager number is the number that SANTIAGO had previously paged on occasions preceding his trips to Brooklyn. When asked if NUNEZ had a phone, Frey indicated that he did and retrieved a cellular telephone from the night stand next to the bed in the bedroom. Task Force Agent Terry Hanson called me and asked me to call the telephone number that had previously called SANTIAGO about arranging his trips to New York. I dialed 718-598-5109 and Task Force Agent Terry Hanson answered. Task Force Agent Terry Hanson also had Task Force Agent Marcos Chavez who had been monitoring the wire intercepts of the Target Telephones listen to NUNEZ's voice and he identified his voice as the voice of the caller from 718-598-5109 who had previously intercepted calls with SANTIAGO. A further search of the apartment yielded no drugs, money or contraband.

### IV. Conclusion

19.    Based on all the foregoing, I submit there is probable cause to believe **JUAN NUNEZ** has conspired with others including but not limited to Santiago to possess with intent to distribute and to distribute 100 grams or more of a mixture or substance containing a detectable

7

amount of heroin, a Schedule I controlled substance, in violation of 21 U.S.C. §§846, 841(a)(1) and 841(b)(1)(B).

Dated this 15th day of October, 2004.

CALICE COUCHMAN
Special Agent, United States
Drug Enforcement Administration

Sworn to and subscribed to before me in Boston, Massachusetts, this day of October 15, 2004.

ROBERT B. COLLINGS
UNITED STATES MAGISTRATE JUDGE

8