**United States District Court**
**District of Massachusetts**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** <br> **v.** <br> **JULIO CARRION SANTIAGO et al.,** <br> **Defendants.** | **Criminal Action No. 04-10336-NMG** |

**MEMORANDUM & ORDER**

**GORTON, J.**

The Superseding Indictment in this case charges 12 defendants in connection with a heroin distribution conspiracy. After a period of investigation, various search warrants were issued on the basis of an affidavit of Drug Enforcement Administration ("DEA") Special Agent Calice Couchman ("the Couchman Affidavit"). Comprehensive searches were conducted pursuant to those warrants on October 15, 2004, and arrests were made in conjunction with those searches.

Defendant Edwin Torres ("Torres") filed a motion to suppress evidence recovered, and all fruits thereof, from a search of storage unit J1 ("Unit J1"), located within a building at 3 Foundry Street, Lowell, Massachusetts. Torres contends that the search and seizure were effected without a warrant, without

probable cause and without lawful consent. This Court held an evidentiary hearing on Torres's motion to suppress on October 21, 2005. After careful consideration of memoranda submitted by the parties and the evidence offered at the hearing, the Court concludes that the government has demonstrated, by a preponderance of the evidence, that it obtained valid consent to the search of Unit J1.

## I. Background

On the evening of October 14, 2004, a magistrate judge issued a search warrant for the Mini Self-Storage facility located at 3 Foundry Street in Lowell, Massachusetts. The warrant described the premises to be searched in detail as follows:

> The first floor of the storage building located at Mini Self-Storage, 3 Foundry Street, Lowell, Massachusetts is located in the left rear portion of the Mini Storage lot. It is located in a two story building with dark colored metal siding on the front of the building with white clapboard siding on the end of the building. A blue and white sign with the words, MINI SELF_STORAGE [sic] Tel 978-453-8206, printed on it, is located on the top right corner of the side of the building. The entrance to the first floor is located on the right end of the building as viewed from Foundry Street. The entrance consists fo [sic] a set of solid white double doors. (A photograph of Mini Self-Storage, 3 foundry [sic] Street, Lowell, Massachusetts is attached as Attachment A-5).

Attached to the search warrant were two photographs of a building that was consistent with the above description and a third photograph showing a single door with a sign reading "JADE" above it. It is not clear from the third photograph where the "JADE"

door is located, i.e., whether it is part of the Mini Self-Storage building in the other two photographs or an entirely separate structure. The Couchman Affidavit described various events involving Torres and the Mini Self-Storage facility but there is no mention of a building with a single door bearing a "JADE" sign. As it turns out, the door marked "JADE" provides entry to a small building that is very close but unattached to the Mini Self-Storage building ("the JADE building").

On the morning of October 15, 2004, DEA agents arrested Torres at his residence in Lowell. Seven law enforcement officers were on site at the time of the arrest. There they encountered Torres's live-in companion, Elizabeth Alvarado ("Alvarado"), and their 17-year-old daughter, Yesenia Torres ("Yesenia"). Most of the interaction between officers, Torres, Alvarado and Yesenia took place in the kitchen, although Yesenia was not present the entire time. With respect to English language abilities, Alvarado appeared to understand and speak none, Torres had a moderate understanding and spoke some, and Yesenia was reasonably fluent.

According to the arrest report and the testimony of Task Force Agent Kevin Swift ("Swift"), Swift advised Torres of his Miranda rights and Special Agent Drouin asked Torres to consent to a search of the upstairs and Torres's car. Torres consented to those searches in broken, but understandable, English.

Although he did not have with him a copy of the search warrant for the rental storage space in Lowell, Swift informed Torres that that space was going to be searched pursuant to a warrant. Torres immediately disclaimed any knowledge of storage space or of any acquaintance with the co-defendant, Julio Santiago ("Santiago"). Yesenia, however, told the agents that some furniture and clothes were in the storage space which belonged to her mother. Seeing some keys in the kitchen, Swift asked about a particular set of keys and Yesenia replied that they were keys to the storage facility.

At this point, the respective testimony of Swift and Yesenia diverges diametrically. According to Swift, he asked if he could use the keys so as to avoid having to enter forcibly, and thereby damage, the storage facility upon executing the search warrant. He concedes that he never specifically asked for consent to access the storage area but testified that after he asked about the keys, Yesenia conferred with Alvarado in Spanish. He saw Alvarado nod her head affirmatively during the conversation and Yesenia then verbally assented to Swift's taking of the set of keys, which apparently included three keys. According to Swift, this interaction led him to believe that Alvarado had consented, through Yesenia, to a search of any storage facility that the keys would open. He testified that 1) the officers never touched, threatened or yelled at either Yesenia or Alvarado at

any time during the interrogation and 2) at the time of the arrest, he did not know that the keys provided access to more than one building located at 3 Foundry Street. While previously on surveillance, Swift had seen Torres enter the Mini Self-Storage building but not the JADE building and he, personally, knew of no connection between Torres and the JADE building.

In stark contrast, Yesenia testified that Swift never asked her or Alvarado for permission to take the keys; he simply took them. Yesenia testified further that she did not have a conversation with Alvarado about the keys and that when Swift took them, Alvarado protested in Spanish. Although Yesenia informed the officers of Alvarado's protest, Swift took the keys nevertheless. Yesenia also testified that the officers yelled at her and that her understanding of English was not very good but she admitted that the officers did not touch or threaten her or her mother that morning.

After the arrest of Torres, Swift gave the keys to Task Force Agent Brian Proulx ("Proulx"), identifying them merely as the keys to the storage area. The key ring contained at least three keys, two of which were covered in blue plastic. That morning, Proulx and several other officers used a key from the key ring to enter the Mini Self-Storage building described in the search warrant. From that facility they seized various documents. They then used a key on the same key ring to open the

JADE building. Once inside, they saw multiple storage units, only one of which, Unit J1, was locked. The lock on Unit J1 was blue, matching the blue plastic on one of the keys that Swift had provided. Using that key, officers opened Unit J1 from which they seized a variety of materials, including items related to narcotics.

## II. Analysis

Torres's motion to suppress, and the government's opposition thereto, require the Court to answer three questions: (1) Has Torres demonstrated an expectation of privacy in Unit J1 sufficient to enable him to challenge the search? (2) Did the scope of the search warrant for the Mini Self-Storage facility encompass a search of Unit J1? (3) Did the government acquire valid consent to a warrantless search of Unit J1? The Court addresses each question in turn.

### A. Expectation of Privacy

The government contends, as an initial matter, that Torres has failed to assert "standing" to challenge the search of Unit J1.[1] As a threshold matter in support of a motion to suppress, the defendant must demonstrate that he had a "legitimate and reasonable expectation of privacy in the premises searched or

[1] Although the term "standing" persists in the common parlance of Fourth Amendment challenges, the First Circuit has made it clear that "standing" is somewhat of a misnomer. See, e.g., United States v. Lewis, 40 F.3d 1325, 1333 n.1 (1st Cir. 1994).

property seized". United States v. Dunning, 312 F.3d 528, 531 (1st Cir. 2002) (citations omitted). The defendant bears the burden of persuasion on this issue. Rakas v. Illinois, 439 U.S. 128, 130 n.1 (1978); United States v. Cruz Jimenez, 894 F.2d 1, 5 (1st Cir. 1990).

To prove a sufficient expectation of privacy, the defendant "must demonstrate not only that he exhibited a subjective expectation of privacy, but also that his expectation was justifiable under the attendant circumstances". United States v. Lewis, 40 F.3d 1325, 1333 (1st Cir. 1994) (quoting Cruz Jimenez, 894 F.2d at 5) (internal quotation marks omitted). In order to meet this burden, the defendant must assert, or otherwise offer evidence of, a legitimate privacy interest in the searched location at or prior to the suppression hearing. Cf., e.g., Lewis, 40 F.3d at 1333 (holding that defendants did not show a reasonable expectation of privacy in seized contraband where they "failed to assert it in support of their motion to suppress"); United States v. Bouffard, 917 F.2d 673, 676 (1st Cir. 1990) (holding that defendant had not shown a reasonable expectation of privacy in a shotgun or the vehicle from which it was seized where there was "no assertion and no evidence" that the defendant had any privacy interest in the shotgun or vehicle).

In determining whether a defendant has shown a subjective privacy interest, the First Circuit has "required little more

than evidence that defendants made some minimal effort to protect their property or activities from warrantless intrusions". United States v. Cardona-Sandoval, 6 F.3d 15, 20-21 (1st Cir. 1993). Whether the defendant has shown an objectively reasonable privacy interest depends upon a contextual inquiry into factors such as "ownership, possession, control, ability to exclude from the premises, or a legitimate presence on the premises". Id. at 21; see also United States v. Aguirre, 839 F.2d 854, 856-57 (1st Cir. 1988).

This Court rejects the government's position that, by denying knowledge of the storage space at the time of his arrest, Torres has foregone his right to challenge the search of Unit J1. Although the amount of evidence is meager, it is sufficient to establish that Torres had a legitimate expectation of privacy in Unit J1. He has submitted an affidavit in which he stated that he had personal items stored in Unit J1 and that he had been making payments on the unit. In addition, Unit J1 was a locked storage unit on the same lot as the Mini Self-Storage facility with which Torres had a connection, and keys to Unit J1 were on the same key ring as keys to the Mini Self-Storage facility. These facts indicate that Torres had some control over, and a possessory interest in, Unit J1. Consequently, Torres has demonstrated a legitimate expectation of privacy sufficient to challenge the search.

**B. Scope of Warrant**

Although conceding that the description in the search warrant did not refer to the JADE building or to Unit J1, the government has tenuously suggested that the search of Unit J1 was encompassed within the scope of the warrant. In making that claim, the government submits that the Court should consider the agents' good-faith belief upon executing the warrant.

Upon review of the evidence presented and applicable precedents, the Court concludes that Unit J1 was not encompassed within the scope of the warrant as issued. First, it is improbable that the magistrate judge believed there was probable cause to search Unit J1 or that he was issuing a warrant to search it. The Couchman Affidavit made no mention of Unit J1 or the JADE building. If the magistrate judge saw the "JADE" photograph attached to the warrant, he likely believed that it depicted an alternate view of the Mini Self-Storage building.

Second, the government's contention that its agents had a good-faith basis for believing that Unit J1 was encompassed within the scope of the warrant is suspect. The warrant on its face clearly did not include Unit J1. Furthermore, the government's good-faith reliance argument is untenable under governing precedent. Where law enforcement relies in good faith on a facially valid warrant that, as it turns out, has been issued erroneously by a neutral and detached magistrate, the

exclusionary rule does not apply. United States v. Leon, 468 U.S. 897 (1984). The Leon exception flows from the rationale that "where the officer's conduct is objectively reasonable, 'excluding the evidence will not further the ends of the exclusionary rule in any appreciable way'". Id. at 920 (quoting Stone v. Powell, 428 U.S. 465, 539 (1976) (White, J., dissenting)). The circumstances of this case do not, however, warrant applicability of the Leon exception. The magistrate judge is not alleged to have erroneously issued a facially valid warrant upon which the officers reasonably relied and then executed within its scope. Agent Proulx's testimony made clear that he knew the JADE building was not included either within the search warrant or the Couchman Affidavit upon which the warrant was based. Consequently, his search of Unit J1 cannot have reasonably been based on a good-faith interpretation of the warrant.

**C. Consent**

The government's principal argument in opposition to Torres's motion to suppress bears upon consent. A warrantless search is presumptively unreasonable unless it falls into an established exception, one of which is consent. See, e.g., United States v. Romain, 393 F.3d 63, 68 (1st Cir. 2004). The government bears the burden of demonstrating, by a preponderance of the evidence, that consent was "knowingly, intelligently, and

voluntarily given". United States v. Marshall, 348 F.2d 281, 285-86 (1st Cir. 2003) (citing United States v. Perez-Montanez, 202 F.3d 434, 438 (1st Cir. 2000)).

A person other than the defendant may give valid consent to a search if he or she "possess[es] common authority over or other sufficient relationship to the premises or effects sought to be inspected". United States v. Matlock, 415 U.S. 164, 171 (1974). The Supreme Court has defined "common authority" in terms of whether there was

> mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

Id. at 171 n.7.

Because there is no evidence suggesting that Torres himself consented to the search of Unit J1, the Court will address whether consent was obtained from Yesenia and/or Alvarado.

**1. Apparent Authority to Consent**

Where a third party lacks actual authority to consent to a search, that party's consent is nonetheless effective where law enforcement "reasonably (though erroneously) believe[d]" that the third party had authority to consent. Illinois v. Rodriguez, 497 U.S. 177, 186 (1990). See also United States v. Meada, 408 F.3d 14 (1st Cir. 2005). Some factors to be considered in determining

whether "apparent" authority to consent was evident include the relationship between the defendant and third party, the degree of access that the third party had to the searched premises and other indications of the third party's interest in the premises. See, e.g., Meada, 408 F.3d at 21; United States v. Robinson, 999 F. Supp. 155, 158-60 (D. Mass. 1998). Because the standard for apparent consent is easier to meet than actual consent, the Court will focus on whether the government agents reasonably believed that Yesenia and/or Alvarado had authority to consent.

In this case, it was reasonable for law enforcement to believe that Alvarado had actual authority to consent to a search of the Foundry Street storage space. When Yesenia told Swift about the storage area, she referred to it as her mother's. Similarly, Yesenia stated that the keys to the storage area found in the kitchen belonged to her mother. Swift's testimony that Yesenia conferred with her mother about the keys further bolsters the position that Alvarado had authority to consent to a search of that area.

It is also clear, however, that Yesenia did not have authority to consent to the search. To rely on Yesenia's consent as a basis for the search, the government must have reasonably believed that Yesenia had "common authority" over Unit J1. In Rodriguez, supra, the government obtained consent from the defendant's girlfriend to search the defendant's apartment.

Although the girlfriend had moved out of that apartment one month earlier, she still had furniture and household effects on the premises as well as a key (though it is unclear whether the defendant knew she had a key). The Supreme Court held in Rodriguez that the foregoing facts did not adequately demonstrate the girlfriend's actual authority to consent to the search. 497 U.S. at 181. The Supreme Court did not consider whether officers reasonably believed that the girlfriend had authority to consent. It therefore remanded the case for a determination of apparent authority. Id. at 189.

Rodriguez demonstrates that having access to a place and even some ownership interest in possessions within that place is insufficient to establish actual authority. Applying the reasoning of Rodriguez to this case, it does not appear that Yesenia had actual authority to consent to the search. Under the circumstances, moreover, it would not be reasonable for agents to have believed that Yesenia had such authority. The agents were not seeking consent to search the Alvarado residence where Yesenia herself lived. They intended to search an off-site location whose only known connection to Yesenia was through her relationship to Torres and Alvarado and her identification of the keys. That evidence is insufficient to show a reasonable belief in Yesenia's "common authority over or other sufficient relationship to" the storage area at issue. Matlock, 415 U.S. at

171.

**2. Voluntariness of Consent**

Whether consent was given voluntarily is determined upon consideration of the totality of the circumstances. Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973); Romain, 393 F.3d at 69 (citing Schneckloth, id.). Consent is involuntary where it results from express or inherent coercion, Schneckloth, 412 U.S. at 228, or where the consenting person lacked sufficient understanding to consent, cf. United States v. Luciano, 329 F.3d 1, 7-8 (1st Cir. 2003) (concluding that defendant demonstrated sufficient understanding of English to render his consent effective). Factors to be considered in evaluating voluntariness include "age, education, experience, knowledge of the right to withhold consent, and evidence of coercive tactics". Marshall, 348 F.3d at 286 (citing United States v. Twomey, 884 F.2d 46, 51 (1st Cir. 1989)). Acquiescence to authorities can be deemed voluntary or involuntary consent, depending on the surrounding circumstances.

Because it was reasonable in this case for law enforcement agents to believe that Alvarado had actual authority to consent but not that Yesenia had such authority, the government must demonstrate that Swift reasonably believed he obtained voluntary consent from Alvarado. Although the available facts make this a close question, after considering all of the testimony elicited

at the hearing and the materials submitted by the parties, the Court finds that Swift reasonably believed that Alvarado provided voluntary consent to the search. As between the conflicting testimony of Swift and Yesenia, the Court finds the testimony of Swift more credible.

After Torres consented to a search of the upstairs of his dwelling and his car, Swift asked him about the Foundry Street storage space. When Torres disavowed any knowledge of such a facility and of any acquaintance with Santiago, Swift had reason to believe he was lying. During the investigation leading up to the arrest, Swift had personally witnessed Torres at the Mini Self-Storage facility. Thus, when Yesenia indicated that there was indeed a storage facility, Swift directed his attention to the two women and the possibility of gaining unforced entry. While it is unlikely that Swift asked for the keys that he observed politely, there is no evidence that he manipulated, forced or otherwise threatened Yesenia or Alvarado into giving him the keys to the storage facility.

That Swift did not coerce the women into handing over the keys comports with a common-sense understanding of the situation. At the time, Swift had no reason to believe that he needed the keys to execute the search of the storage facility, which had been authorized by a warrant. Without any knowledge of a connection between Torres and the JADE building, Swift had no

reason to know or suppose that a warrantless search of Unit J1 would be conducted. Because it is reasonable to presume that Swift believed the search would be validly executed with or without keys, it is likely that, had Alvarado truly protested about the keys, Swift would not have taken them but would have simply proceeded to conduct a forced entry as planned. Although it is unclear to what extent Alvarado understood the conversation in English between Yesenia and Swift, the Court finds credible Swift's testimony that he saw Alvarado nod during a Spanish conversation between her and Yesenia and that he then obtained the vicarious assent of Yesenia to his possession of the keys. Under those circumstances, it was reasonable for Swift to believe that Alvarado had voluntarily consented to the search for the mutually beneficial purpose of avoiding damage to the storage facility.

In contrast to the generally credible testimony of Swift, Yesenia's testimony was fraught with inconsistencies. Although Yesenia seemed to have a modest intellect and is a high school graduate born and raised in the United States, she claimed that she did not understand English well. Other statements were also of questionable veracity. For instance, initially, Yesenia seemed to deny 1) having any acquaintance with the defendant, Torres, 2) that there was any relationship between Torres and her mother or 3) that Torres lived at the residence where he was

arrested. Later, however, she referred to Torres as her "Dad" and conceded that she had known him since she was a baby and that they had lived together in Lowell for many years. At another point, Yesenia testified that she had never heard Torres speak any English, which was in stark contrast to Swift's credible testimony that Torres had spoken "broken", but understandable, English on the morning of his arrest.

### 3. Scope of Consent

After the government has demonstrated that a third person had apparent or actual authority to consent to a search, and that consent was voluntary, the government must still show that its search did not exceed the scope of consent given. E.g., United States v. Turner, 169 F.3d 84, 87 (1st Cir. 1999) (citations omitted). Scope of consent is determined by a test of objective reasonableness: "what would the typical reasonable person have understood by the exchange between the officer and the subject?" United States v. Melendez, 301 F.3d 27, 32 (1st Cir. 2002) (quoting Florida v. Jimeno, 500 U.S. 248, 251 (1991)). Thus, courts must look "beyond the language of the consent itself, to the overall context, which necessarily encompasses contemporaneous police statements and actions". Turner, 169 F.3d at 87. Context is important because "[t]he scope of a [consensual] search is generally defined by its expressed object". Jimeno, 500 U.S. at 251.

In this matter, therefore, the government must show that the search it executed pursuant to Alvarado's consent was within the scope of that consent. At the time of Torres's arrest, Swift described the area to be searched in a general manner, referring to it no more specifically than as the storage space at 3 Foundry Street in Lowell. There is no evidence that Swift referred explicitly to the Mini Self-Storage building nor that he had a copy of the warrant in hand. Based on the "expressed object" of the search, the Foundry Street storage facility, the Court finds that the search of Unit J1 was within the scope of consent.

That Swift himself may have believed that the Mini Self-Storage building was the only location to be searched does not define the scope of consent. Rather, it is defined by that to which a reasonable person under the circumstances would have believed consent was given. In this case, a reasonable person would likely have believed that consent was given to search any storage area at 3 Foundry Street, Lowell, to which the keys provided access. There is no reason to believe that Alvarado, when she consented, via Yesenia, impliedly understood that the search would be limited to the Mini Self-Storage building. Consequently, once Alvarado consented to the search, Unit J1 was within the scope of that search.

**ORDER**

Based on the foregoing memorandum, the motion to suppress of defendant Edwin Torres (Docket No. 124) is **DENIED**.

**So ordered.**

Nathaniel M. Gorton
United States District Judge

Dated: November 2 , 2005